Case No. 19-1101ML Pacific Maritime Association Petitioner v. National Labor Relations Board Mr. Connealy, Petitioner Mr. Weiss, for the response Good morning, Your Honors. May it please the Court. Michael Connealy on behalf of Petitioners. The National Labor Relations Act makes it an unfair labor practice to refuse to bargain collectively over the so-called mandatory subjects of bargaining. But a long line of precedent from this Court, as well as the Board, holds there is no continuous duty to bargain over a mandatory subject that the parties have already bargained over. And where the parties have memorialized that bargain in a collective bargaining agreement, an unfair labor practice would occur only if the employer departed so far from the terms of the collective bargaining agreement as to effectively terminate or modify it. This Court has often stressed that the Board's authority to find this type of unfair labor practice is constrained by the Board's very limited role in the enforcement and interpretation of collective bargaining agreements. The Board is not allowed to treat the mere breach of a contract as an unfair labor practice because Congress specifically denied the Board that power. Parties instead are supposed to rely on the contractual grievance and arbitration procedures in their contracts to vindicate their views about what those contracts mean. And for this reason, the Court does not give any deference to the Board's interpretation of a collective bargaining agreement, making this petition for review quite unlike a lot of them. The upshot of these principles is that the Board is not permitted to inject itself into a purely contractual dispute, as the Court put it in Honeywell. And we believe that is exactly what the Board did here. It essentially held that petitioners had not complied with the terms of the Watchman's Agreement with Local 26 in their handling of the Marine clerk's complaint against Mr. Place. Because the Board is not entitled to make such a determination, the Court should set that order aside. And as the Court knows, there were two bases for the Board's unfair labor practice conclusion here. There was the contract modification theory and the unilateral change theory. Mr. Kaley, what is the appropriateness of those two theories being presented for the same charge? Well, that's a question that both the Board and the Courts, I think, have grappled with over the years. We think that it's inappropriate for the Board to be able to characterize the same conduct as both a breach of a contract and an action that has no connection with the contract. We think that the key question under the terms of Section 8A, 5, and 8D is whether the parties have fulfilled their obligation to bargain over the mandatory subject of bargaining. And here, I think both sides agree that the mandatory subject of bargaining is first and foremost the imposition of contested disciplinary action or perhaps the standards of conduct with respect to harassment in the workplace. But it's clear that the parties bargained over both of those subjects here. And so if it's the case, as we contend, that the Petitioners did not violate the terms of the collective bargaining agreement with respect to those mandatory subjects of bargaining, it seems to undermine that very conclusion to turn around and say that they unilaterally imposed new terms and conditions of employment with respect to the same mandatory subjects of bargaining. So you do think it's inappropriate to bring both of those for the same underlying conduct? Well, we think that if you agree with us. So I'm talking right now about cases in which the employer is relying on a term in the contract as a sort of justification for the actions. And in those situations, as opposed to ones where there's nothing in the contract that covers the mandatory term of bargaining, yes, we do think that they're two sides of the same coin. And we think that's the view that this court adopted in the Honeywell decision, where in addressing what was first and foremost in contract modification argument, the court relied on its contract coverage case law, which addresses the unilateral change sort of situation. And we think that the First Circuit in the Bath Marine Draftsmen Association cases came to the same conclusion, essentially, which is in both cases, if we're talking about contract interpretation, well, the board has to stay within its very narrow lane, because Congress wanted those issues to be aired in grievance arbitration, which is a much more streamlined process. And it's the process that the party has bargained for in many of these contracts. I would also point the court on this very question to the metal craft case, which is a board decision that we cite in our reply brief from 2019. And in addition to addressing the standard for sound arguable basis, the board grapples with this question a little bit and seems to come to a similar place at the end of the day, that if the employer is raising a contractual defense to a contract modification sort of charge, then the unilateral change theory kind of falls out of the picture. And so we think that's the correct view, and we think that's the view that's most consistent not only with the statutory text, which requires bargaining over, as the courts have interpreted it, mandatory subjects of bargaining, but also the long line of precedent that talks about the board's limited role in enforcing and interpreting disputed. I guess I didn't read your briefs to take on, to contest the idea that there is a sound arguable basis doctrine that applies. I thought what your argument was is that the board was just wrong to think that the interpretation of the contract was lacking in a sound arguable basis. That's exactly right, Your Honor. We think that the sound arguable basis standard is the correct standard, but that it's a pretty – it's not a very demanding standard. And we agree with Your Honor's characterization. So if the sound arguable basis standard does apply, then there is such a thing as an unlawful – a ULP. Is it unlawful? I can't even remember what the U stands for. Unfairly constructed. Unfair. Thanks. I knew it was not unlawful. Unfair. So it's unfair labor practices. There is such a thing as that with respect to the interpretation of the contract if there's no sound arguable basis for the interpretation of the contract. That's correct, Your Honor. And if there's no sound arguable basis for the interpretation of the contract – I know you disagree with that premise – but if there is no sound arguable basis for the interpretation of the contract and the subject matter at issue pertains to mandatory bargaining, then the other doctrine kicks in, too. Yes. I would say – what I was trying to express was that I don't think you would find a situation very often, maybe ever, where there is a sound arguable basis for the employer's position in the contract, but also the contract does not cover that mandatory subject of bargaining so that you could then be exposed to an unfair labor practice under the alternative unilateral change theory. Yeah. But I do agree that if you lack a sound arguable basis, then there's an unfair labor practice maybe under both theories as well. I was just trying to resist the pulling apart of those two theories, as I think the Board attempts to do sometimes where there may be a sound arguable basis, but then it might still be a unilateral change that's not covered by the contract. But under the sound arguable basis standard, as Your Honor was alluding, we do think that the petitioners satisfied that here. And the starting point for that test, I would submit, is the Board's decision in Bath-Ironworks, which says the first thing that the Board has to prove is that there was a specific term in the collective bargaining agreement that petitioners modified. And here, the Board's decision only points to two items in the collective bargaining agreement and the Watchman's agreement. That would be the procedures for handling employer complaints and the Article 18H, which talks about how the grievance machinery shall be the exclusive remedy with respect to any dispute arising under the collective bargaining agreement. And under both of those provisions, we submit, the petitioners had a sound arguable basis for thinking that their conduct was consistent with those terms. And first, on the procedures for employer complaints, what's undisputed here was no employer complaint. Long Beach considered filing one and thought it lacked sufficient evidence to pursue it, and so declined to do so. The complaint here was filed by the Marine Clerk under a totally separate bargaining agreement, the PCLNCA, and it was processed as such, but neither Long Beach nor Pacific Maritime encouraged the Marine Clerk to file that or advocated for a finding of liability against Mr. Plays. That was a process driven solely by the Marine Clerk and his union, Local 63, and so cannot be construed, even if you set aside the deferential sound arguable basis standard, as the filing of an employer complaint here. And so we would submit that when you also look at it through the sound arguable basis standard, then it follows even more forcefully that the petitioners did not modify the terms of the agreement. And with respect to the exclusive remedy clause, we've argued that if you read the clause as a whole, it shows that the exclusive remedy provision is talking about remedies used by the union, the employer, or a covered employee. As I just said, the employee here is not covered by the Watchman's Agreement. He's the Marine Clerk covered by the PCLNCA, and we don't even think that this is a dispute arising under the Watchman's Agreement because it really arose and proceeded under the PCLNCA. And so if you look at the sound arguable basis standard that the Board has expressed in the Bath Iron Works case, and then again in the metal craft case, which I just mentioned, it's clear that the petitioners had reasonable interpretations of the agreement and maybe not the strongest. Maybe they are, maybe they're not, but that's not the Board's role to figure out which interpretation is the better view of the contract. Why would it make sense to read the agreement in the way that you're suggesting, given that we know that for the employer to impose discipline when the employer initiates a complaint, they need to go through the article against the Watchman, where the Watchman is the alleged perpetrator, that the Article 18 complex is what kicks in? Well, it's not clear that the employer always has to file an employer complaint in order to impose discipline. There are certainly categories of conduct for which they do not have to do so. Isn't there a proviso that deals with the four categories? Right, there's a proviso that says that the Labor Relations Committee cannot impose rules that restrict the employer's ability to take unilateral discipline in those categories. The agreement does not say very clearly one way or the other whether in all other cases an employer complaint must be filed. Often employers will file such complaints, but it's not clear from the record, and I don't think the Board found that there is a clear, unbroken practice of employer complaints in imposition of discipline. I take your Honor's point that why would the parties have wanted the imposition of discipline to occur through other mechanisms? Outside the auspices of this, right. In any situation. And I think that the multi-bargaining unit context here is very important, because the workplace harassment allegations in particular, and the reason why Section 13.2 exists for the PCL and CA, are things that the employer is not in a position to observe often. Certainly Pacific Maritime is not on the worksite in many of these cases, and so is not positioned to assess whether the conduct occurs, and is not positioned to pursue those claims on its own based on an allegation that it believes that the harassment occurred. And so in the PCL and CA, it was important to allow the employees to file complaints on their own. The Watchman's Agreement simply doesn't address that kind of scenario, because the only covered employees undisputed had no right to pursue those kinds of complaints under the agreement. And so if we were dealing with that sort of situation, where a watchman was trying to complain of workplace harassment, I think that Your Honor's sort of purposes of the contract point would have some force. But the ability of the Local 26 to constrain the ability of uncovered employees, like the Marine clerk here, is something that Pacific Maritime at least would not have agreed to, because it knew it was bound by the PCL and CA as well. And so as the court's decision in the Local Union 1395 case points out, where you don't have a meeting of the minds between the parties, you don't have an enforceable contract provision. And here, there's really no evidence to suggest that Pacific Maritime or Long Beach was open to limiting the ability of Marine clerks to pursue discipline. And under the terms of the PCL and CA, the employer has no ability to resist or no discretion with respect to a decision under Section 13.2. That was the testimony at the ALJ hearing. If the watchman's agreement is silent as to what happens in this type of situation, then why isn't it a unilateral change when the employer, when PMA imposes this type of discipline on the watchman? Because that would be a mandatory subject of bargaining. And so if the contract is silent? Yes, I understand. I understand your question, Your Honor. The contract is silent with respect to the specific fact pattern that we're dealing with here. That's true, the inter-union sort of complaint of misconduct. But the Court's contract coverage doctrines are very clear, cases are very clear, that in order for an agreement to cover a mandatory term of bargaining so as to prevent a determination of a unilateral change, the contract does not need to address or mention the specific factual pattern. And I would point the Court to the United States Department of Justice versus FLRA case from 2017 that we cite. And in that case, the Court dealt with this exact concern and said that the parties had negotiated over a set of procedures to deal with the mandatory term of bargaining. And here, likewise, the parties clearly have a set of procedures in place for dealing with disputed imposition of discipline. In fact, as my friend on the other side notes on page 32 of the Board's brief, if the language in the watchman's agreement does not encompass contested disciplinary actions against bargaining unit employees, it is difficult to conceive what language would. Well, that much we agree with. The mandatory subject bargaining that is contested disciplinary actions is clearly addressed in Article 18C of the watchman's agreement, which gives the union and the worker who believes that discipline has been improper the right to grieve and arbitrate that. And if the union can instead go to the National Labor Relations Board and short-circuit that process, I say short-circuit but that's in some ways inaccurate because the National Labor Relations Board proceedings take years, as this case shows, whereas the grievance and arbitration proceedings is supposed to be a speedy and less formal way of addressing these kinds of disputes. But if they can short-circuit that by going to the Board instead, well, the very repose and stability that the collective bargaining relationship is supposed to include will be significantly undermined. And so we think that the mandatory term of bargaining for purposes of the contract coverage issue is the imposition of contested discipline. The parties had a set of rules in place to deal with that issue. The union chose not to avail itself of those rules here, and we think it should have had to do so. I see I'm running over my time. The other point that's sort of independent of the points we've talked about already is the question that's in some ways antecedent to the contract coverage question, which is whether there was an established practice shown by the Board's general counsel that the parties departed from. We think that the general counsel bears the burden of showing that because it is an element of a unilateral change case, and we think that the Board failed to do so here. And instead, it's trying to require the petitioners to show that there was an established practice to justify what took place here. But if that were the case, the Board would be able to avoid showing this most essential requirement of its unilateral change case and shift the burden of proof onto petitioners. I think it's undisputed here that the parties had not confronted this pattern before, but the terms of the PCL&CA and the letters of understanding were, especially since 2014, completely clear that this sort of complaint could proceed against a watchman under the Section 13.2 procedures, and the union was on notice of that. Its president testified, Local 26's president testified, that she was familiar with the 13.2 procedures, and that's why she didn't want to include them for watchmen in their contract. And if that's the case, then any argument that the mere agreement to allow such procedures should have been brought up as an unfair labor practice within six months of when that policy was adopted, so no later than 2014 and probably even earlier than that. And because the Board has not shown a departure from an established practice on any of the three points that we addressed in our brief, we think that that is an independent reason for rejecting liability under the unilateral change theory. Let's hear from the Board. Good morning. May it please the Court. Eric Weiss on behalf of the NLRB. This case involves the fundamental purpose of the National Labor Relations Act, which is the protection of the collective bargaining process and the results that that process produces. If I can take a step back and begin at the level of the legal violations here and to answer your initial question, Judge Rao, the Board found in this case both a midterm modification violation and a unilateral change violation, which are distinct violations in terms of the theory of what's at issue, the standard of reviewing it, and the actual remedy. So are they different violations or are they different theories of the same violation? Because the Board's decision talks about it in a number of places as a theory of violation. Well, they're both theories of a violation of Section 885 of the Act, which prohibits the refusal to bargain, but they're ultimately distinct actual unfair labor practices. So, for example, in this case, the Board's remedy includes distinct remedial components to both, in this case, either one would be sufficient for most of the remedy, which is making whole the individual who is unlawfully suspended. But for the midterm modification, there is a remedial provision that the employer needs to abide by the terms of the contract. In contrast, with a unilateral change violation, the remedy is a requirement that the employer has to notify the union and bargain to give faith impasse before taking a unilateral change. So the midterm modification is actually a broader or more comprehensive remedy because it prevents an employer from taking this change during the life of the contract, whereas with a unilateral change, even if the Board finds an unfair labor practice and an unlawful unilateral change and there's an active collective bargaining agreement, the employer can still say, well, we think this change is important and we deem to make it anyway, and so we're going to bargain with the union, and if we get to good faith impasse, we can then implement it unilaterally. So the Board did find two distinct violations here, and I'd also note that the employer did not challenge the fact that the Board found both in its opening brief or before the Board. And in addition, this Court, in the Dodge v. Naperville case, which we cite in our brief, has previously enforced a Board decision finding both violations. And to clarify what's at issue, which I think is helpful in the Beth Arnor's case, the way that the Board frames it there, the midterm modification issue is whether there's something in the contract that forbids what the employer did, whereas the unilateral change question is whether there's anything in the contract that affirmatively privileges their right to act unilaterally under this Court's contract coverage standard. Can I ask this? So I think you've answered it based on what you already said, but the Board starts out its decision by saying we affirm its findings, the ALJ's findings, that respondents violated 85 and 1 under either of the general counsel's alternative theories. But then to grant your cross-application for enforcement, it wouldn't be enough just to sustain one of the theories, right, because the order has provisions that pertain uniquely to both. That's correct, Your Honor. To enforce the full order, the Court would need to affirm both violations. As I was mentioning earlier, if the Court were to affirm one or the other, that would substantially, either one would be sufficient for most of the Board's order, including the make-all relief, but the Board is seeking enforcement of both. So they are substantially overlapping theories, and they could be pled in the alternative, but in this particular case, the Board found two distinct violations which have different standards, the one being the sound arguable basis standard. Because the remedy is more aggressive, it's a more difficult standard, and then their contract coverage standard for the unilateral change violation. And to move on to the midterm modification violation, I just point out to the Court, as we explained in our brief, there are basically three levels of the Board's finding of a violation here. First of all, there's the clear language of the Watchman's Agreement, which the Board found, I think, reasonably prohibits the type of discipline of a local 26 Watchman that occurred here, because if you read Article 18 in whole, it's clear that the parties contracted to a procedure where any form of discipline, such as suspension of a local 26 Watchman, had to go through this contractual procedure. And to just briefly summarize what that procedure is, there's an initial step, which is sort of an informal resolution, which if the Court looks in particular at Article 18d.2, which specifically references cases of discipline or discharge, it requires the employers at the ports to consult with a representative local 26 and to attempt to resolve the issue informally, which it appears from the record is how perhaps a majority or a vast majority of these cases are resolved. But if you have a situation where the employer wants to discipline a local 26 Watchman and it cannot be resolved or the union does not agree at this initial stage, the contract requires the employer to file an employer complaint with the Joint Labor Relations Committee, which then considers the issue and hears evidence. And if they cannot resolve it, it goes through a contractual arbitration mechanism. And how does this article apply in a case in which the complaint is brought by another employee covered by a different agreement? Well, Your Honor, if you read Article 18, there's simply no exception to this contractual procedure. In fact, Article 18h makes clear that this is, by the terms of the contract, the exclusive procedure for dealing with alleged Watchman misconduct. And there's no carve-out to that suggesting that there's any different process if it's a non-unit employee making the allegation or limiting the contract to allegations of harassment, for example, made by bargaining unit employees. And in addition to Article 18, Article 16 of the contract specifically prohibits discrimination by Watchmen against any person to quote the contract. It's not limited to Watchmen on Watchmen harassment. And in addition, empirically, the parties have historically resolved allegations of harassment or misconduct using the Article 18 procedure and citing Article 16 and Article 18. In fact, in this exact case, the general manager for Long Beach Container Terminal wrote a letter to the union warning them, a non-disciplinary letter warning them, that if there were future instances of misconduct, it would result in an employer complaint being filed with the Joint Liberation. But is the Board's view that the Marine clerk can't invoke the 13.2 procedure? Well, Your Honor, the Board made clear that the issue is not the Marine clerk's rights to, you know, have a contractual procedure under his contract negotiated by his exclusive representative to protect him from harassment and to allow him to make these claims. The issue in this case is whether the Marine clerk and his union have the right to basically dictate the disciplinary procedures for an employee who's in a separate bargaining unit with his own. Right. So how does it work out in practice? So if we are in a situation in which the Marine clerk does have the ability to proceed under 13.2 of his agreement, then how does Article 18 then kick in? Because I take your point that, well, but then there's this other agreement that says where the watchman is the person who's going to be the subject of discipline, this agreement can be read to say the employer, in order to impose the discipline, has to proceed by the Article 18 route. But then there's a separate agreement that says when a non-watchman or a Marine clerk is the one who wants to print the complaint, they can go by 13.2. So then what happens? How do these things square? Well, what happens, Your Honor, is as the board noted in a footnote, the two contracts are not on equal footing insofar as they both purport to dictate how a local 26 watchman can be disciplined. So, I mean, the practical result would be that the Marine clerk would file the Section 13.2 grievance, and that would not be a concern in itself. But at the point where the employers apply that procedure to a local 26 watchman and then actually discipline him, that's a violation of the Act because it both modifies the agreement they entered into with the local 26 employees representative, and it's also a unilateral change. So it's not that the board invalidated the 13.2 agreement, but the board found that for the employers to then basically choose which contract they prefer and apply that to an employee in a different bargaining unit, that is a violation of the Act. So in that sense, the Marine clerk does not have a statutory or legal or contractual right to require this employee to be disciplined. But I just want to stress that the board was not invalidating Section 13.2 where there's a different contract. So from the board's perspective, basically what the board says is, look, yeah, there's a separate contract that has a 13.2 procedure in it. The employer just got itself into a situation in which it has these two contracts. That's not for us to work out. It's just that we know that for purposes of a watchman who's going to be the subject of discipline, his union negotiated the Article 18 procedure, and that just has to be followed. We're not sitting in a view of what's going to happen with respect to the 13.2 procedure. It does look like there's a contract that gives the Marine clerk the ability to invoke that, but that's on the employer. That's exactly right, Your Honor. And I'd also point out that Section 13.2 is a fairly expansive procedure, and what we're talking about here is really just a single parenthetical in the 2014 Letter of Understanding. So even the scope of what we're referring to is a very small part of Section 13.2. But to expand on your point, Your Honor, first of all, I just want to stress the board found here a statutory violation. And so there's the statutory element of, you know, the watchmen have a statutory right to have their own exclusive bargaining representative who's the only union or representative who bargains with the employer over their terms of employment. But even if this were a breach of contract case, which it is not, it's a well-known element of contract law that it's not a defense to an alleged breach to say, well, we deliberately entered into two conflicting contracts. Typically under contract law, the defendant would be liable to both entities for a potential breach of contract. But, again, here there's a much more narrow issue that's actually on review before the court, which is whether the board was justified in finding a violation of the NLRA in Section 85 of that statute. So returning just briefly to the midterm application violation and the employer's argument to the court, I'd just like to emphasize what we say in our brief, that the fact that the employers did not file an employer complaint in this case is essentially itself a violation, because the contract creates this procedure where if the employers want to discipline an employee over the objections or without the consent of the union, they need to file a complaint with this contractual joint labor relations committee. So it's not a sound, arguable basis of the contract to simply say, well, we deliberately went outside of what the contract requires, and so therefore we're not within the parameters of the contract. In addition, I would dispute what the employers argued in their opening argument, that the board did not find that there was an unbroken practice of filing employer complaints. That's true in the sense that a lot of discipline does not require an employer complaint, because it's resolved at this informal stage. But the board did find, as a factual matter, and in fact the record shows, has no evidence of any contrary discipline, that all discipline against Local 26 Walkman went through this Article 18 procedure. So as we note in our brief, it's curious that the employers are now proposing an interpretation of the contract where they have essentially an unfettered right to unilaterally issue discipline without going through this procedure, because there's no evidence. They haven't produced a single example of any employee ever being disciplined without going through that procedure. And so even if the court does not agree with the board that the language of the Walshman's agreement is clear, as we point out in our brief and the board points out in its decision, the uniform past practice of the parties confirms the board's reading of the contract. And in addition, something very significant in this case is that for Section 13.2 in particular, the parties have actually bargained over this in successive rounds of collective bargaining, and Local 26 has historically made it very clear that they do not want this procedure where Local 26 Walshman can be disciplined based on individual employee complaints without the involvement of the union and without the involvement of the Joint Labor Relations Committee. So it's not for the board or this court to determine, you know, whether there's merit to that position, but the fact is, as the board found and substantial evidence supports, that the parties specifically discussed this at bargaining, and the union convinced the employers to withdraw their proposals to incorporate Section 13.2 or similar procedures into the Walshman's agreement. When you say that the language of the agreement is dispositive in response to the point that there was no employer complaint filed in this case, your view of the agreement has to be that, yeah, there's some provisions that deal with the employer filing of a complaint, but the agreement also has to cover the situation in which an employer doesn't file a complaint, right? Well, your honor, our position is that under Article 18.d.2, if it's an instance of discipline or discharge, the employer needs to attempt to resolve the matter with Local 26 involved at this initial informal stage. And it appears that's how most discipline is handled. But if Local 26 objects to discipline and the employer still wants to discipline or suspend an employee to do so, they need to file a complaint with the Joint Labor Relations Committee. And also, if I could just point out some context, in case that procedure seems counterintuitive or very beneficial to the union, it's important to remember this isn't a traditional employer relationship like, you know, a factory worker. This is an employer relationship which is handled through a dispatch hall. So there are steady Walshman who work for the same employer, but many of the Walshman, including Mr. Please in this case, are dispatched out on a short-term basis, perhaps for a day at a time. And that's why the parties contracted your procedure where if an employer wants to suspend or affect the dispatch rights of a Walshman, they need to go through this more formalized process and to file a complaint. And I see that I'm over time. If the court wouldn't mind, I would just say very briefly on the unilateral change violation. I just wanted to clarify two legal elements that the employer has repeated in their argument. First of all, in terms of the general counsel and the board's burden to prove a violation, the board's burden is only to show that there was a new policy implemented, which it is undisputed happened in this case. It's not the board's burden to show that there was a binding established past practice preventing unilateral action by the employer because the fundamental unilateral change doctrine is that employers have an affirmative bargaining obligation before unilaterally making changes to employees' terms and conditions of employment. Secondly, very quickly, on the contract coverage standard, as we point out in our brief, this court's well-established contract coverage standard is that an issue is covered if the employers have already reached agreement to that issue and if there is a term in the contract which grants the employers the right to act unilaterally. And so it's not sufficient to just say that the parties generally negotiated over a subject such as discipline. And to the extent that the employers are arguing that in this case the union should have filed a grievance under the Watchman's Agreement, that's a separate argument. That would be an argument that the board should have deferred this case to arbitration. The employers have essentially waived that argument on appeal. In addition, the board specifically addressed that at Joint Appendix page 35 and explained why deferral was not appropriate in this case, the main reason being that there's no evidence that the employers would have allowed Local 26 to grieve this through Article 18 because the employer's position at the time was that this was all handled by Section 13.2 and that's why the union attempted to file an appeal under Section 13.2, which wasn't successful and did not file agreements under Article 18. And so that's not dispositive and that does not go to the contract covered issue, which requires the employers to show that there is some provision in the contract that affirmatively grants them the right to act unilaterally, and the employers have simply failed to do that in this case. So the board would request enforcement in full, and if the court doesn't have any further questions, thank you. Thank you. Just a few points, Your Honors. The notion that the petitioner's position is that there's an unfettered right to discipline under the Watchman's Agreement is just not accurate. We do raise the grievance and appeal process mentioned in 18C because it shows that there are limits to the petitioner's authority, and it's not a deferral argument to say that the board should have deferred. We did make that argument below and did not re-raise that argument here. It's a point about the contract coverage standard that this court has formulated, which depends on whether the employer and union have bargained about a subject and memorialized that bargain, creating a set of rules governing their future relations. That's how the court has traditionally formulated the contract coverage doctrine, going back to United States Postal Service, and that's the version of the doctrine that should apply here. I just wanted to clarify one thing I said in response to Judge Srinivasan's question. The language that the contract uses in 18C about the employer's existing right to discipline is language that often gets litigated in grievances about imposition of discipline, and it would have been in question for the arbitrator to decide whether the existing right to discipline allowed discipline in this particular case. But, of course, we didn't have a grievance about what that language meant in this case. Secondly, the Long Beach Container Terminal didn't seek out discipline, and, in fact, the board ignored that the watchman here, Mr. Place, had stopped working at Long Beach voluntarily at his union president's suggestion, and he had previously been working at Long Beach as a steady, contrary to what my friend on the other side said about how he would just go to Long Beach intermittently. But he stopped doing that before the hearing took place here, and we think that's another reason why Long Beach should not be held responsible. And then, finally, just to get back to the notion that the board can say that the watchman's agreement and the PCL&CA are not on equal footing, the board's view, inevitably, is that PMA and Long Beach were not permitted to do what the PCL&CA requires here, which is automatically comply without a discretionary step of filing a further complaint, which the parties to the PCL&CA did not want to happen because such procedures are usually not confidential, the employee no longer has the power to control them, and it would undermine and eviscerate the 13.2 procedure if the marine clerk's complaint had to be relitigated under the watchman's agreement. And the board says that it's not merely trying to interpret a contract or resolve a contract breach here, but it is impossible to read the decision here as doing anything other than limiting the terms to which Pacific Maritime and Long Beach agreed under the PCL&CA, and under a long line of cases, the courts have said that federal law is not supposed to regulate the substance of collective bargaining agreements. It's merely to provide for the procedures for reaching and enforcing them. And the board should not be enforcing those agreements, particularly in circumstances here where there are multiple agreements at issue and finding an unfair labor practice inevitably involves finding that one of those contracts cannot be complied with fully. So we would ask that the court vacate the board's order, and thank you. Thank you. I take the case under advisement.
judges: Rogers, Srinivasan, Rao